AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
NOV 15 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. **19MJ5111**
)
Samsung S10 Cellphone )
IMEI: 357295100717037 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

*Code Section*                          *Offense Description*
21 U.S.C. 952, 960 and 963    Importation of Controlled Substances and conspiracy to do the same.

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Whitney Faber, HSI S/A
Printed name and title

Sworn to before me and signed in my presence.

Date: 11/15/2019

_____
Judge's signature

City and state: San Diego, CA

Andrew G. Schopler, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Whitney Faber, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic devices (collectively the "**Target Devices**"):

   a. Samsung S10 Cellphone
      IMEI: 357295100717037
      (**Target Device 1**)

   b. Samsung S10 Cellphone
      IMEI: 357295100156772
      (**Target Device 2**)

and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952, 960, and 963, as more particularly described in Attachments B-1 and B-2. This search supports an investigation and prosecution of DALILA CERVANTES-CASILLAS ("CERVANTES) and CHARLES JOSEPH SANCHEZ ("SANCHEZ") for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. Both of the **Target Devices** were seized from CERVANTES on October 30, 2019, at the time she and SANCHEZ were arrested at the Otay Mesa, California Port of Entry ("POE"), as they attempted to smuggle methamphetamine into the United States. The **Target Devices** are currently in the possession of Homeland Security Investigations at 2255 Niels Bohr Court, San Diego, CA 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that a search of the **Target Devices** as described in Attachments A-1 and A-2 will produce evidence of the aforementioned crimes, as described in Attachments B-1 and B-2.

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents.

1

The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause for the requested warrant.

## EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6. I am a Special Agent (SA) with ICE-HSI and have been so employed since September 2018. I am currently assigned to the Deputy Special Agent in Charge, San Ysidro Office, Contraband Smuggling Group 5, and my duties include investigating the trafficking of illicit controlled substances; and the importation and distribution of illegal substances. I have training and experience in multiple investigative areas, to include conducting investigations and making arrests based on violations of Title 21, United States Code Sections 952, 960, and 963.

7. I have had approximately 26 weeks of intensive training at the Federal Law Enforcement Training Center at Glynco, Georgia. These 26 weeks were comprised of approximately 12 weeks of the basic criminal investigator training program and approximately 14 weeks of HSI Special Agent Training. I have received training in identifying various controlled substances and conducting Title 21 controlled substances investigations.

8. Prior to my position as an HSI Special Agent, I was employed as a United States Border Patrol (USBP) Agent from March 2003 until September 2018. As a USBP Agent, I conducted many criminal investigations involving violations of federal and state laws including, but not limited to, alien smuggling, narcotics smuggling, kidnapping, extortion and organized criminal activity.

9. I have personally participated in and conducted investigations of violations of various State and Federal criminal laws, including those related to narcotics violations. I have arrested or participated in the arrest of persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates. I have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks.

10. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have learned that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers, and portable radios to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voice-mail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators. Typically, drug traffickers are in telephonic contact with co-conspirators immediately prior to and following their illicit transactions to negotiate prices and quantities, coordinate meeting times and locations, and then to discuss future transactions or future payments if the narcotics were "fronted" (delivered without being paid for in advance).

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

    g. The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

    a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the **Target Device(s)**; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

13. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Some of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

14. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling in near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them. When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

15. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I have learned that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I have learned that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

## FACTS SUPPORTING PROBABLE CAUSE

16. On October 30, 2019, at approximately 7:40 AM, CERVANTES, a United States Citizen, SANCHEZ, a United States Citizen, and J.S., a minor and United States Citizen, applied for entry into the United States from Mexico through the Otay Mesa, California Port of Entry (OTM POE) in vehicle lane 8 (eight). CERVANTES was the driver and registered owner of a 2003 Ford F-150 ("the vehicle") bearing California license plates 8D88935. SANCHEZ and J.S. were passengers of the vehicle.

17. According to a report by Customs and Border Protection Officer (CBPO) J. Gutierrez, on October 30, 2019, CBPO J. Gutierrez was performing pre-primary operations when he encountered a Ford F-150 bearing California license plates 8D88935 ("the vehicle") driven by CERVANTES in pre-primary late 8 (eight). CBPO Gutierrez inspected the underside of the vehicle and noted the spare tire looked overly large and very clean. CBPO Gutierrez asked CERVANTES for her entry document. CBPO Gutierrez noted that CERVANTES was shaking when she presented her United States Passport Card. CBPO Gutierrez noted that CERVANTES was talking rapidly and appeared nervous during questioning. CERVANTES stated she was on her way to Chula Vista, CA. CBPO Gutierrez received two negative Customs declarations from

CERVANTES. CBPO Gutierrez called for the assistance from a Canine Enforcement Officer (CEO).

18. According to a report by CEO E. Roman, CEO Roman and her Human & Narcotics Detection Dog (HNDD) Tango were conducting pre-primary operations when their assistance was requested by CBPO J. Gutierrez. CBPO Gutierrez requested a screening of the vehicle. CEO Roman and Tango conducted a screening of the vehicle. CEO Roman received an alert from Tango to the spare tire attached to the vehicle. CERVANTES, SANCHEZ, and J.S. were escorted to the secondary lot for further inspection.

19. According to a report by CBPO I. Perez, CBPO I. Perez was assigned to the OTM POE Vehicle Secondary Lot as a Z-Portal Non-Intrusive Inspection system operator. CBPO Perez screened the vehicle with the Z-Portal. CBPO Perez examined the Z-Portal images of the vehicle and detected anomalies in spare tire.

20. According to a report by CBPO M. Saunders, CBPO M. Saunders conducted a secondary screening of the vehicle. CBPO Saunders noted that there was access to the spare tire from the exterior of the vehicle. CBPO Saunders noted that the spare tire was new and not the same type of tire installed on the wheels of the vehicle. CBPO Saunders found the tool for lowering the tire mounted inside the engine compartment. CBPO Saunders noted that the tool could only be accessed by releasing the hood latch from inside the vehicle. CBPO Saunders noticed the dust on the tool was clean on the upper part of the handle. Upon inspecting the tire, CBPO Saunders discovered 80 (eighty) packages hidden inside the spare tire of the vehicle, with an approximate weight of 47.04 kilograms. A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine. CERVANTES, SANCHEZ, and J.S. were placed under arrest at approximately 10:05 AM for further investigation. CBPO Saunders later discovered a wireless GPS tracker device with a SIM card located in the driver-side door storage compartment. CBPO Saunders removed the SIM card from the device.

21. I was notified of the event, responded to the San Ysidro POE, and subsequently placed CERVANTES, SANCHEZ, and J.S. under arrest. I further seized the vehicle, the methamphetamine packages, miscellaneous documents and the **Target Devices**. Following her arrest, CERVANTES acknowledged that the **Target Devices** were hers, and after being advised of her *Miranda* rights she provided passcodes for both devices. After providing these passcodes, CERVANTES withdrew her consent to search the phones, and neither phone was searched. In a post-*Miranda* statement, CERVANTES denied knowledge of the drugs in her spare tire.

22. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of CERVANTES and SANCHEZ, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. For the reasons set forth above, I request permission to search the **Target Devices** for items listed in Attachment B for the time period from August 2, 2019, up to and including October 30, 2019.

## METHODOLOGY

23. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that

reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

26. Based on all the facts and circumstances described above, there is probable cause to conclude that CERVANTES used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

27. Because the **Target Devices** were promptly seized during the investigation of CERVANTES and SANCHEZ's trafficking activities and has been securely stored

since that time, there is probable cause to believe that evidence of illegal activities committed by CERVANTES and SANCHEZ continues to exist on the **Target Devices**. As stated above, I believe that the date range for this search is from August 2, 2019, up to and including October 30, 2019.

28.   WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and to seize items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Whitney Faber
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this 15th day of November, 2019.

The Honorable Andrew G. Schopler
United States Magistrate Judge

## **ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

The following property is to be searched:

      a. Samsung S10 Cellphone
         IMEI: 357295100717037
         (Target Device 1)

The **Target Device 1** is currently in the possession of Homeland Security Investigations at 2255 Niels Bohr Court, San Diego, CA 92154.

## **ATTACHMENT B-1**

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of August 2, 2019, up to and including October 30, 2019:

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;
b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;
c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;
d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;
e. tending to identify the user of, or persons with control over or access to, **Target Device 1**; and/or
f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**